# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
       **Plaintiff,**

   **v.**                                            **Case No. 13-CR-193**

**EDWARD PATTERSON**
       **Defendant.**

## DECISION AND ORDER

Defendant Edward Patterson moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons that follow, I grant his motion.

## I. FACTS AND BACKGROUND

Defendant pleaded guilty to conspiracy to possess with intent to distribute marijuana, travel in aid of a racketeering enterprise, and use of a telephone to facilitate possession with intent to distribute marijuana. Defendant and his co-actors obtained marijuana from a source of supply in California, which they distributed in this district. Defendant used three McDonald's restaurants he owned and operated to obtain currency to fund his drug trafficking, to conceal his drug proceeds, to recruit individuals to sell marijuana on his behalf, and as locations to conduct drug transactions. (PSR ¶14.)

The parties agreed that defendant was responsible for the distribution of 100 to 400 kilograms of marijuana, as well as at least 40 grams of Oxycodone. (PSR ¶ 35.) Agents also discovered four firearms, along with nearly $65,000 cash and various controlled substances, on execution of a search warrant at defendant's residence. (PSR ¶ 37.)

Following his arrest, defendant had conversations with a fellow detainee (who,

unbeknownst to defendant, was cooperating with the government) about hiring a hit man to kill witnesses in the case. Defendant subsequently sent a letter to and met with the putative hit man (actually an undercover agent) about the job. (PSR ¶¶ 37-40.) Defendant denied that he intended to have anyone harmed, indicating that he was actually trying to set up the other detainee as part of his own ongoing cooperation with the government. He did concede that he was not authorized by federal agents to cooperate against the "hit man" and that he was not completely truthful in his cooperation with federal authorities. (PSR ¶¶ 41, 99.)

The pre-sentence report calculated a base offense level of 26, U.S.S.G. § 2D1.1(c)(7); added 2 levels for firearm possession, U.S.S.G. § 2D1.1(b)(1); 4 levels based on defendant's leadership role, U.S.S.G. § 3B1.1(a); and 2 levels for obstruction of justice, U.S.S.G. § 3C1.1; then subtracted 3 levels for acceptance of responsibility, U.S.S.G. § 3E1.1; for a final level of 31. (PSR ¶¶ 95-112.) Defendant had no prior record, so the PSR set the criminal history category at I. (PSR ¶ 115.)

At the sentencing hearing on April 17, 2015, Judge Randa adopted the PSR's guideline calculations, which produced an imprisonment range of 108-135 months. The government recommended a sentence of 130 months, while the defense suggested 6-7 years. Judge Randa imposed a sentence 108 months, the low end of the range, followed by 3 years of supervised release. Regarding the "hit man" issue, he indicated the "Court draws no conclusions . . . so there are two versions of the facts." (R. 241 at 5.)

Defendant is currently serving his sentence at FCI Williamsburg, with a projected release date of December 5, 2021.[1] On July 21, 2020, he filed a pro se motion seeking compassionate

---

[1]https://www.bop.gov/inmateloc/ (last visited November 3, 2020). Defendant has been in custody since October 2013. (R. 265 at 2.)

release. I referred the matter to Federal Defender Services ("FDS"), pursuant to the court's standing order regarding First Step Act motions. On August 25, 2020, FDS filed a supplemental motion on his behalf. The government has responded and defendant replied. The matter is ready for decision.

## II. DISCUSSION

### A. Compassionate Release Standards

Pursuant to the First Step Act of 2018, the district may grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

The statute contains three requirements: (1) the defendant must first make a request to the warden before applying to the court; (2) the defendant must then demonstrate to the court that "extraordinary and compelling reasons" warrant a reduction in his sentence; and (3) the court must determine whether, even if such reasons are shown, a reduction of the sentence would be inconsistent with the applicable § 3553(a) factors and the need to protect the public. See United States v. Rodriguez, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019).

The statute does not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. See 28 U.S.C. § 994(t).[2] The Commission's policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1) (A) extraordinary and compelling reasons warrant the reduction . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,

---

[2]Congress did state that: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Id.

4

> > (II) suffering from a serious functional or cognitive impairment, or
> >
> > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
> > (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
> >
> > (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which allowed defendants to bring their own motions. As a result, many district judges "have concluded that, after the First Step Act, the Commission's policy statement does not constrain a court's independent assessment of whether extraordinary and compelling reasons warrant a sentence reduction under § 3582(c)(1)(A)." United States v. Somerville, No. 2:12-CR-222-NR, 2020 U.S. Dist. LEXIS 93935, at *15 (W.D. Pa. May 29, 2020). In United States v. Scott, No. 17-CR-156, 2020 U.S. Dist. LEXIS 85554, at *17-18 (E.D.

5

Wis. May 15, 2020), I adopted this position. See also United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

Giving the statutory terms their ordinary meaning, a defendant seeking compassionate release must demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, regular, or common, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. Scott, 2020 U.S. Dist. LEXIS 85554, at *20; see also United States v. Ramirez, No. 17-10328, 2020 U.S. Dist. LEXIS 83363, at *6 (D. Mass. May 12, 2020) (indicating that U.S.S.G. § 1B1.13 provides helpful guidance on the factors that might support compassionate release, although it is not ultimately conclusive). In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health status, or other specific circumstances;[3] on the other hand, courts have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020) (explaining that § 3582(c)(1)(A) contemplates a sentence

---

[3]Courts have in evaluating the medical conditions alleged as grounds for release often relied on the guidance issued by the Centers for Disease Control ("CDC"). See, e.g., United States v. Chambers, No. 08-cr-30057, 2020 U.S. Dist. LEXIS 198005, at *5-6 (C.D. Ill. Oct. 23, 2020).

6

reduction based on the particular circumstances of where the defendant is housed and his personal health conditions).

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons supporting compassionate release and/or that release would undermine the goals of the original sentence. United States v. Black, No. 1:11-cr-00083, 2020 U.S. Dist. LEXIS 142523, at *11 (S.D. Ind. Aug. 10, 2020); United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020). The court must also consider whether release would pose "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

**B. Analysis**

    **1. Exhaustion**

Defendant made a request for compassionate release to the warden, which was denied on June 12, 2020. (R. 265-1.) He made another request July 3, 2020 (R. 265-2), which has apparently not been addressed, and more than 30 days have passed. The government agrees

7

that the statute's exhaustion requirement is satisfied. (R. 269 at 8.)

## 2. Extraordinary and Compelling Reasons

Defendant indicates that he suffers from hypertension, which makes him particularly vulnerable to the effects of COVID-19. (R. 265 at 1; R. 267 at 8, 10, 35, 41.) The CDC has acknowledged that having heart conditions, including heart failure, coronary artery disease, cardiomyopathies, and pulmonary hypertension, increases the risk of severe illness from COVID-19, and that having other cardiovascular or cerebrovascular disease, such as hypertension (high blood pressure) or stroke, may increase the risk of severe illness from COVID-19.[4] Defendant also submits a letter from Dr. Barbara Benjamin, who has reviewed defendant's BOP medical records, and indicates:

> Mr. Patterson is 45 years old and suffers from hypertension.
>
> The CDC (Centers for Disease Control) list hypertension as a risk factor for more severe outcomes with COVID-19. High blood pressure can damage the body in many ways. It can seriously hurt the heart, arteries, brain, kidneys, and eyes. Hypertension is also associated with inflammation; this virus causes inflammation in the body and is thought to be associated with stroke and inappropriate clotting. Having hypertension has been associated in multiple studies with severe disease in hospitalized patients with COVID-19.
>
> It is my medical opinion, based on review of his medical records that Mr. Patterson is at higher risk for serious infection from COVID-19. Therefore, I recommend that he be removed from prison and transferred to a lower risk setting while this pandemic is active.

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#heart-conditions (last visited November 3, 2020). Defendant notes that the government has in other cases conceded that a CDC-recognized condition constitutes an extraordinary and compelling reason. (R. 265 at 8.) In this case, the government acknowledges that "if an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of 'extraordinary and compelling reasons.'" (R. 269 at 10.)

8

(R. 265-3.)

Defendant relies primarily on United States v. Salvagno, No. 5:02-CR-51, 2020 U.S. Dist. LEXIS 109879 (N.D.N.Y. June 22, 2020), in which the court reviewed in detail the scientific literature regarding hypertension and COVID-19. In response to the government's assertion that the prisoner's hypertension was "too 'mild' and 'controlled' with medication to be considered a risk factor," id. at *31, the court stated:

> The NIH advises in a general manner . . . that any underlying health condition poses a greater risk if it is "uncontrolled." Indeed, the general statement that if a certain underlying health condition is a risk factor, then more severe or uncontrolled manifestations of that health condition are associated with a relatively higher risk of a severe case of COVID-19, seems truistic. But the authorities cited above indicate an association simply between "hypertension" broadly, and severe illness and death from COVID-19. None of these sources indicate that people with certain ranges of blood pressure readings or stages of hypertension are not at significant risk, and the Government does not offer any scientific research supporting such a proposition. Indeed, one of the studies cited above concludes that hypertensive individuals, medicated or not, face at least a two-fold risk of death from COVID-19 compared to non-hypertensive individuals (although, according to this study, the risk is higher for those who are not taking some form of medication). Existing research indicates simply that hypertension is a risk factor; and according to BOP medical professionals who have regularly examined him, Salvagno has hypertension.

Id. at *32-33 (internal citations omitted).

Defendant further notes that 8 staff members at his facility have tested positive, creating a serious risk of spread among inmates there. (R. 265 at 1.) He contends that the absence of positives among inmates does not change the calculus;[5] "public health officials agree that jails and prisons are ideal environments for the spread of contagious diseases. Once the infection reaches inside the facility's walls, it may be too late to effectively protect vulnerable

---

[5]As of November 3, 2020, the BOP reports 5 inmates and 8 staff positive at FCI Williamsburg. https://www.bop.gov/coronavirus/ (last visited November 3, 2020).

9

persons[.]" (R. 265 at 10, quoting United States v. Marshall, No. 71-CR-101, slip op. at 3 (E.D. Wis. May 22, 2020).) He cites cases in which the court granted release, despite the absence of cases at the particular institution, where the prisoner would be vulnerable in the event of an outbreak. (R. 265 at 10-11.)

The government acknowledges that the CDC has recognized hypertension as a COVID-19 risk factor. However, the government contends that hypertension is a common disorder, often managed by medication, and defendant's medical records indicate that his hypertension is "well-controlled" on HCTZ. (R. 267 at 8.) The government notes that many courts have denied compassionate release when hypertension was the only condition alleged as creating increased risk from COVID-19. (R. 269 at 7, 11-12.) The government further notes that cases in which release has been granted to hypertensive inmates usually involved other co-morbidities or a severe outbreak at the particular facility. (R. 269 at 12-13.) The government contends that here, the defendant is 45 years old, with controlled hypertension, otherwise healthy, and housed at a facility minimally affected by COVID.[6] (R. 269 at 13.)

In reply, defendant notes that many of the cases cited by the government were decided

---

[6]The government also discusses the BOP's response to the COVID-19 pandemic, including the precautions being taken to limit spread of the virus and the release of some inmates to home confinement under the CARES Act. (R. 269 at 2-6.) I have no reason to question those efforts. Nevertheless, thousands of inmates have tested positive and 130 have died. https://www.bop.gov/coronavirus/ (last visited November 3, 2020). The CDC has recognized the particular vulnerability of incarcerated persons to COVID-19 infection, as they live, work, eat, study, and participate in activities in congregate environments, with few options for social distancing due to crowded conditions. Daily staff movements, transfers of people between facilities, and visits from outsiders (even as limited by the BOP's action plan) create many opportunities to introduce COVID-19 to a facility. See United States v. Babbitt, No. 18-384, 2020 U.S. Dist. LEXIS 195976, at *15-16 (E.D. Pa. Oct. 21, 2020). At the time the government filed its response, just 1 inmate was positive at defendant's facility (R. 269 at 2); that number soon increased to 5, in addition to the 8 staff members.

10

before June 25, 2020, when the CDC added hypertension to the list of conditions that present an increased risk. (R. 271 at 3-4.) The government also failed to address Salvagno, in which the court reviewed the issue in depth, specifically rejecting the argument that "controlled" hypertension presents no increased risk. See also United States v. Pompey, No. CR 97-0638, 2020 U.S. Dist. LEXIS 123517, at *5 (D.N.M. July 14, 2020) ("The CDC states that individuals with these conditions are at a greater risk; not only individuals with uncontrolled conditions.").

As reflected in the parties' submissions, courts have differed over whether a hypertension diagnosis will support a request for compassionate release. "Even though the CDC has recognized hypertension may heighten the risks associated with COVID-19, many courts have found that a hypertension diagnosis alone is not sufficient to show extraordinary and compelling circumstances, especially if the condition is well managed." United States v. Green, No. 17-20822, 2020 U.S. Dist. LEXIS 193469, at *12 (E.D. Mich. Oct. 20, 2020) (collecting cases); see also United States v. Jacobs, No. CR 5-64, 2020 U.S. Dist. LEXIS 175477, at *3 (W.D. Pa. Sept. 24, 2020) ("Courts have indicated that hypertension alone does not generally constitute an extraordinary and compelling circumstance that justifies relief under Section 3582."); United States v. Jones, No. 1:15-cr-00092, 2020 U.S. Dist. LEXIS 170424, at *10-11 (S.D. Ind. Sept. 17, 2020) ("The Court finds, consistent with other district courts, that hypertension and COVID-19 do not qualify as extraordinary and compelling reasons for compassionate release where the defendant does not suffer from other health or age-related risks."). But see United States v. Bates, No. ELH-09-0183, 2020 U.S. Dist. LEXIS 194285, at *24 (D. Md. Oct. 20, 2020) ("[N]umerous courts have found that, in light of the COVID-19 pandemic, hypertension, along with other conditions, qualifies as a compelling reason for compassionate release."); Salvagno, 2020 U.S. Dist. LEXIS 109879, at *21 ("For many courts,

11

this strong correlation [between hypertension and severe illness] has been sufficient to find that COVID-19 poses a heightened risk to hypertensive inmates, for purposes of compassionate release."); United States v. Richardson, No. 2:17-cr-00048, 2020 U.S. Dist. LEXIS 108043, at *8 (E.D. Cal. June 19, 2020) ("Here, Defendant's hypertension alone places him at significant risk of complications."); United States v. Hilow, No. 15-cr-170, 2020 U.S. Dist. LEXIS 96517, at *10 (D.N.H. June 2, 2020) ("[E]ven controlled hypertension in conjunction with COVID-19 is a health risk."); United States v. Sanders, No. 2:19-cr-20288, 2020 U.S. Dist. LEXIS 67595, at *10 (E.D. Mich. Apr. 17, 2020) ("Several courts . . . have identified hypertension as an underlying medical condition that renders a prisoner higher-risk, weighing against continued detention during the COVID-19 pandemic.").

In two recent cases before me prisoners requested release based on hypertension. However, in both the prisoners failed to present evidence that they currently suffered from this condition, so I was not required to determine whether hypertension would support release. See United States v. Meyer, No. 14-CR-230, 2020 U.S. Dist. LEXIS 199117, at *21 (E.D. Wis. Oct. 27, 2020) (denying motion where the defendant presented no evidence that he currently suffered from hypertension); United States v. Ricks, No. 17-CR-141, slip op. at 11-12 (E.D. Wis. Oct. 13, 2020) (denying motion where recent records indicated that previous diagnosis of hypertension was wrong).

As I have noted in other cases, rigid rules have no place in the compassionate release context. See United States v. Hicks, No. 18-CR-227, slip op. at 12 (E.D. Wis. Oct. 7, 2020) (declining to adopt per se rule that prisoner who contracted COVID-19 and recovered could not thereafter obtain compassionate release). While courts have properly relied on the expertise of the CDC in evaluating § 3582(c)(1)(A) motions during the COVID-19 pandemic, deeming an

12

inmate diagnosed with any of the conditions listed by the CDC, regardless of severity, automatically eligible for compassionate release would be contrary to the individualized analysis contemplated by the statute.[7]

What tips the scale in this case is the report from Dr. Benjamin, who reviewed defendant's BOP medical records and opined based on that review that defendant is at higher risk for serious infection from COVID-19. Dr. Benjamin gives no indication that the apparent effectiveness of medication in controlling defendant's specific form of hypertension ameliorates that risk. The government does not in its response challenge Dr. Benjamin's opinion or offer any medical evidence of its own. I accordingly find that defendant has established a basis for compassionate release.

### 3. Section 3553(a) Factors

Defendant notes that Judge Randa imposed a sentence of 108 months, which effectively communicated how seriously the court viewed his conduct and was intended as a deterrent. He argues that whatever deterrent effect the sentence would have has already been achieved, after 7+ years, particularly given the fact that he had no criminal history and had never served a prison sentence before. (R. 265 at 12.) He further notes that regardless of how the court handles his motion, he will be released to the community within the next year; accelerating that release by a few months will not endanger the public but will permit him to avoid the risk of

---

[7]The CDC itself makes this distinction with certain conditions, such as asthma, indicating that the risk of severe illness from COVID-19 is increased in moderate to severe cases. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#asthma (last visited November 3, 2020). The CDC also distinguishes between different forms of hypertension, as indicated above.

13

infection and possible complications. (R. 265 at 12-13.)

Defendant also cites a recent study by the Sentencing Commission indicating that prisoners released early under the "Drugs Minus Two" guideline amendment did not re-offend at higher rates than similarly situated prisoners who served out their sentences (R. 265 at 13), as well as Commission research indicating that persons like him with zero criminal history points re-offend at very low rates, as do persons in his age group (R. 265 at 14). Finally, defendant indicates that he has a solid release plan, proposing to live with his wife and son. (R. 265 at 15.)

In opposing release under § 3553(a), the government notes the scale of defendant's drug operation, his possession of firearms, and his alleged attempt to hire a hit man to kill witnesses, all of which suggest danger to the public. (R. 269 at 14-16.) As defendant notes in reply, however, Judge Randa considered all of these factors, including the disputed allegation that defendant wanted to harm witnesses, in imposing a sentence at the low end of the guideline range. What Judge Randa could not have considered is that an unprecedented pandemic would place defendant at high risk of severe illness while he served that sentence. (R. 271 at 2, 8.)

Significantly, granting defendant's motion at this point, with barely a year left on his 9-year term (less than that if one counts anticipated pre-release halfway house time), produces a minimal reduction. The result may have been different had defendant moved after serving but a fraction of the prison term the court deemed necessary. See United States v. Turner, No. 18-CR-142, 2020 U.S. Dist. LEXIS 175572, at *12 (E.D. Wis. Sept. 24, 2020) ("[T]his is not a case in which a prisoner is seeking release after serving a mere fraction of his sentence. And, because defendant has already served a far longer term than in any of his previous cases,

14

reducing the prison sentence to time-served will still provide specific deterrence.").

Nor will granting this limited reduction endanger the public. Defendant will be returned to the community in a matter of months regardless of my ruling here. He has no prior record, statistics suggest a low recidivism rate for like offenders, and he has solid plan for release. Supervision in the community, with an added condition of home confinement, will suffice to address any risk he may pose. A home confinement condition will also ensure that he remains under close control for a period of time comparable to what he likely would have served in prison.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion (R. 265) is granted, and the prison sentence is reduced to time served. As a condition of supervised release, he shall comply with the conditions of location monitoring for a period of 180 consecutive days. During this time, he shall remain at his residence except for employment and other activities approved in advance by the supervising probation officer. All other terms and conditions of the original sentence remain as set. An amended judgment shall issue forthwith.

Dated at Milwaukee, Wisconsin, this 4th day of November, 2020.

/s Lynn Adelman
LYNN ADELMAN
District Judge